THE COMSTOCK-CASTLE STOVE COMPANY

*v.*

W. W. BALDWIN, Sr.

*Opinion filed November 1, 1897—Rehearing denied December 14, 1897.*

1. CREDITOR'S BILL—*when rule requiring return of execution nulla bona does not apply.* The rule requiring the return of an execution *nulla bona* before a judgment creditor can resort to equity, does not apply where, after a court of equity has assumed jurisdiction for the final distribution of the debtor's estate under a creditor's bill filed in behalf of *all* creditors, on the return *nulla bona* of an execution issued on another judgment, the judgment creditor, at the invitation of the court, becomes a party to the suit.

2. SAME—*allegations of cross-bill charging fraud held sustained by the evidence.* The allegations of a cross-bill filed in creditor's bill proceedings, charging that a certain judgment against the estate was fraudulently procured, are held by the court, after full consideration, to be sustained by the evidence.

3. FRAUD—*assignee with notice cannot enforce fraudulent judgment.* The assignee of a fraudulent judgment, having knowingly been a party to the fraud, cannot enforce such judgment as against the valid claim of a cross-complainant in a proceeding by creditor's bill.

4. EQUITY—*equity will go beneath the garb of a transaction to discover its real character.* Courts of equity will not be prevented from protecting the equitable rights of parties by the mere garb or form in which persons devising fraudulent schemes to obtain the property of others without recompense have clothed their transactions.

5. APPEALS AND ERRORS—*when Supreme Court cannot review action of Appellate Court in not dismissing appeal.* The action of the Appellate Court in not dismissing an appeal on the ground that it had not been taken in time, cannot be reviewed by the Supreme Court where the question of dismissal was not properly raised by motion to dismiss in the Appellate Court.

*Comstock-Castle Stove Co.* v. *Baldwin,* 63 Ill. App. 255, reversed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. ABNER SMITH, Judge, presiding.

JAMES E. PURNELL, for appellant.

EDWARD OWINGS TOWNE, JAMES H. STANSFIELD, and
SMITH, HELMER, MOULTON & PRICE, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

This is an appeal from a judgment of the Appellate
Court for the First District, affirming a decree of the cir-
cuit court of Cook county, dismissing for want of equity
the cross-bill of the appellant filed in a certain chancery
cause pending in said circuit court to a creditor's bill
brought by one Charles Hanselman, and awarding the
fund in controversy to appellee.

It appears from the evidence that one Charles Bald-
win had for several years been engaged in business in the
city of Chicago as a wholesale stove merchant, under the
name of Charles Baldwin & Co., and that in the latter
part of the year 1887 he took steps to form a corporation,
by the name of Charles Baldwin Company, with a capital
stock of $100,000, divided into shares of $100 each. Charles
Baldwin subscribed for 550 shares, William J. McKay,
his book-keeper, subscribed for 449 shares, and Alvin C.
Thatcher, also in the employ of the said Charles Baldwin,
subscribed for one share. The said three stockholders
constituted the board of directors. The company never
received anything for its capital stock except perhaps
$100 for one share, and the stock of merchandise, effects,
credits, etc., of the said Charles Baldwin & Co., which,
as shown by the evidence, was not worth at the time more
than from $20,000 to $25,000. The record shows that, by
resolution of the board of directors, McKay was appointed
as a committee to investigate the stock of goods, etc.,
owned by Charles Baldwin & Co., and to report upon the
same, together with its value, upon a proposition from the
corporation to purchase the same; that McKay reported
such value to be $75,000 and recommended that the corpo-
ration purchase the same at that figure and pay therefor
$55,000 of its capital stock, and give its judgment notes,

aggregating $20,000 for the balance of the purchase price; that this report was adopted and the stock and the judgment notes issued and delivered to Charles Baldwin. McKay testified that he signed such papers as he was requested to sign, but did not think the transactions mentioned ever in fact took place.

The property was turned over to the company, and early in January, 1888, it commenced business in the place of Charles Baldwin & Co. When the company became organized, 448 of the 449 shares subscribed for by McKay were returned to the company and held as treasury stock, and McKay's note was surrendered to him. Thereafter the business was conducted in the name of the corporation, but it was managed and controlled by Charles Baldwin substantially in the same manner as before the corporation was formed. The corporation had no more capital or property after its formation than what was before owned by Charles Baldwin & Co., and received no consideration whatever, as before said, for its capital stock except the property, effects and good will of said Charles Baldwin & Co. The valuation placed by McKay upon the said property and effects was largely fictitious, and was evidently made by the direction of the said Charles Baldwin. There was, therefore, really no consideration whatever for the judgment notes of $20,000 made and delivered by the company to the said Charles Baldwin. Not only so, but he did not pay the company more than about one-half of the face value of the capital stock issued to him. With these judgment notes of $20,000 against the company in his pocket, Baldwin ran the company into debt for merchandise, and, without any system of book-keeping, soon left its affairs in such confusion that there was no record of its liabilities or assets. When, after a period of only a few months, the creditors of the company and his own could be no longer postponed, he abandoned the company, left the city of Chicago and did not thereafter appear in the litigation which ensued, either as a witness or a party.

It seems that he thereafter kept himself concealed from all persons interested except appellee.

Soon after the organization of the company, and in February, 1888, the corporation, through Charles Baldwin, purchased from appellant two car-loads of stoves, ranges, etc., which gave rise to the claim of appellant herein. One of these car-loads was, by the direction of Baldwin, shipped to Omaha, Nebraska, where he kept another place of business under another name, and the rest were shipped to the company's house in Chicago. Appellee, W. W. Baldwin, Sr., the uncle of Charles Baldwin, had a son, W. W. Baldwin, Jr., who then kept a livery stable in Chicago, but who, some time before that, had been in the employ of another stove company of which his father, the appellee, was the manager, and in that capacity had collected and received moneys of that company of upwards of $4000 for which he failed to account, and which, according to the testimony of appellee, were accounted for and paid by him, and which, together with other moneys advanced by appellee to his said son, left the latter indebted to appellee in a considerable amount. W. W. Baldwin, Jr., was insolvent, but soon after Charles Baldwin abandoned the company's business in Chicago, W. W. Baldwin, Jr., it appeared, was possessed of the judgment notes, of the aggregate amount of $20,000, above mentioned which Charles Baldwin had assigned to him, and his attorney, who was also the attorney for the said company and had been from its organization, had judgment entered against the Charles Baldwin Company for $20,383.02 on March 12, 1888, in the Superior Court. Execution was issued thereon on the same day and levied on all of the available property and assets of the company in Chicago.

E. O. Towne, who had been the attorney of the company and who also acted for W. W. Baldwin, Jr., in procuring the judgment by confession, had obtained from the company on March 9, 1888, its promissory note for legal

services for $387, which was credited on March 10 with $215.17. This note was endorsed to one Charles H. Hanselman, who was the original complainant in this case and an employee of W. W. Baldwin, Jr. On March 13, Towne, at the request of Hanselman, procured one Crawford, an attorney, to obtain a judgment by confession on this note in favor of Hanselman, against the company. The judgment was obtained accordingly, execution was issued, and afterward, on March 23, returned *nulla bona.* Thereupon, on the same day, the original creditor's bill was filed in this cause by Hanselman, by his said solicitor, Crawford. This bill was filed by Hanselman, not only on his own behalf, but also on behalf of other judgment creditors of the said company. Under that bill, and on the day it was filed, the court appointed one Ingram as receiver of the company and also of Charles Baldwin. Three days after the bill was filed the court made an order that the Comstock-Castle Stove Company, appellant herein, and all other creditors having any interest in the suit, might come in and be made parties defendant to the same within ten days of the date of such order. Thereupon appellant, on the day of the entering of said order, and all other creditors of the said company and of Charles Baldwin at a later date, appeared and set up their respective claims by answers and cross-bills. Some of the creditors had previously instituted attachment proceedings, others had commenced suits at law in which judgments were thereafter obtained. One of these was appellant, which commenced its suit on March 23, 1888, in the Superior Court of Cook county, and obtained its judgment against the company for $1981 on the fifth of the following month.

On March 30, 1888, after appellant had appeared as a defendant under the order of the court, the appointment of Ingram as receiver was revoked, and on motion of the parties Charles H. Bradley was appointed receiver and took possession of all the property and assets of the com-

pany, subject to the levy of the Baldwin execution. By
the consent of all parties in interest, but subject to their
respective interests in the proceeds of sale, the receiver
soon after, by the order of the court, sold to the appel-
lee all of the property and assets, of every description,
of the Charles Baldwin Company for the sum of $13,000.
During the progress of the litigation, appellee, by nego-
tiation with the different creditors of the company, pur-
chased and procured from them assignments of their
respective claims at about one-third of their face value,
and the same were paid out of the purchase money paid
to the receiver by appellee for the property and effects
of the company. In this manner appellee became the
apparent owner of all the claims of the company's cred-
itors except that of appellant, and thereafter had con-
trol of the several petitions and cross-bills filed by such
creditors. It should, however, be stated that appellee
had negotiated for the purchase of all such claims be-
fore the sale was made by the receiver, and the order of
the court directing such sale recited that appellee had
acquired and succeeded to the interest of all parties to
the suit except the Comstock-Castle Stove Company. It
was also provided in the same order, by the consent of
all parties to the suit, that the receiver should pay over
to appellee all of the moneys in his hands on the deposit
by appellee with the clerk of the court of $2200, which
should be held to abide the result of the litigation con-
cerning appellant's claim, and to secure whatever in-
terest it should be found entitled to in such proceeds
so turned over to appellee. The $2200 was so deposited
and the receiver was discharged.

Afterward, on November 11, 1889, appellee filed his
supplemental bill, reciting the previous proceedings, in-
cluding the order of March 26, 1888, allowing appellant
and all other creditors to be made parties to the cause,
and that they had come in in pursuance of said order, and
that he, appellee, had purchased and had assigned to him

all other claims in the cause against the company, and alleged that they were valid and subsisting claims against the effects and proceeds thereof of the company, and that by reason of such assignments he was a creditor of said company and of Charles Baldwin & Co. in an amount aggregating more than $48,000, together with costs and interest, and that all such claims should be paid and satisfied in the order of their priority as existing liens, and as the court might determine in respect to their several equities, out of the funds deposited with the clerk, and prayed that the lien under the Baldwin judgment, the Hanselman judgment, and the judgment liens acquired by the several of his assignors, be declared prior and superior to all other creditors.

Appellant answered this supplemental bill and filed its cross-bill thereto, setting up its claim and its judgment thereon of $1981, set up the facts and circumstances attending the organization of the company, and other facts and circumstances, many of which are above recited, and alleged that said $20,000 Baldwin judgment was fraudulent; that the judgment notes and assignment thereof, upon which the judgment was entered, were without consideration and were made to defraud creditors; that appellee was a party to the fraudulent scheme; that the goods purchased from appellant were obtained by false and fraudulent representations as to the credit and standing of the company, and alleged that appellant's said demand should be first satisfied out of the proceeds in the hands of the clerk. After overruling appellee's demurrer to this cross-bill, issues were made, the cause referred to the master, and upon his report, based principally upon the ground that appellant had failed to have an execution issued upon its judgment returned by the sheriff *nulla bona*, that appellant had no standing in a court of equity, the trial court dismissed appellant's cross-bill for want of equity, and decreed that the clerk turn over the fund of $2200 to appellee, appellant to pay the costs.

Aside from a few questions which are merely incidental to the principal questions involved in this case, there are really but two questions which go to the foundation of appellant's right to maintain its said cross-bill. The first is,—and it is one of serious importance,—must appellant be denied the right to recover in this proceeding an otherwise meritorious debt, for the sole reason that it failed to have an execution issued upon its judgment at law returned unsatisfied, before its intervention and the filing of its cross-bill in this cause? The second is, were the allegations of appellant's cross-bill of the alleged fraudulent and collusive scheme, and of appellee's connection therewith actually or constructively, whereby appellant's property was obtained and the property and assets of the company diverted from the payment of its honest debts, sustained by the proofs?

It has been held by a long line of cases in this court, —and the doctrine is too well settled and too familiar to require their citation,—that before a creditor can go into a court of equity to reach and apply the equitable assets of his debtor to the satisfaction of his debt he must first reduce his demand to judgment, and have execution issued and returned no property found wherewith to satisfy such judgment. It is also well settled by repeated decisions, that where the purpose of the bill is merely to set aside some fraudulent conveyance out of the way of his execution, the bill may be filed without such return of execution and as soon as judgment is recovered. (*Weis* v. *Tiernan*, 91 Ill. 27; *Weightman* v. *Hatch*, 17 id. 281; *Newman* v. *Willetts*, 52 id. 98; *Bennett* v. *Stout*, 98 id. 47; *Amick* v. *Young*, 69 id. 542; *Wisconsin Granite Co.* v. *Gerrity*, 144 id. 77; *Dillman* v. *Nadelhoffer*, 162 id. 625.) It is held, however, that where a bill is filed to remove out of the way of an execution a fraudulent conveyance of land, the judgment must, at the time of the filing of the bill, be a lien upon such land. (*Newman* v. *Willetts*, and *Bennett* v. *Stout, supra.*) So, even if this were regarded in the same light as a bill

to set aside a fraudulent conveyance, still appellant's cross-bill could not be maintained upon the doctrine of the cases cited, for the reason that there was no lien created by appellant's judgment upon the personal property of the defendant corporation without an execution issued and delivered to the sheriff. It is therefore plain, that unless upon some other principle of law applicable to the nature of this case and to the circumstances attending it, and to the action of the court and the parties therein, appellant was excused from having an execution issued and returned *nulla bona*, the decree below that it had no standing in a court of equity must be affirmed.

It is perfectly clear that before appellant could recover its judgment and cause a levy to be made of an execution, all of the property and effects of the company were in the hands of the receiver and could not be taken on execution. This is apparent from the evidence, and had also been demonstrated by the return unsatisfied of the execution on the judgment of Hanselman, the complainant in the original bill, who filed his bill on behalf of himself and all other judgment creditors who should come in, etc. Still, it was held in *Russell* v. *Chicago Trust and Savings Bank*, 139 Ill. 538, that the custody of the fund by a receiver appointed at the instance of a particular judgment creditor upon a creditor's bill filed by him to obtain satisfaction of his own judgment, and not on behalf of creditors generally, "would seem to present no obstacle in the way of another creditor obtaining a lien subordinate to that of the bill already filed but superior to all other creditors, by exhausting his remedy at law in filing a second creditor's bill." And it was held in that case, that where the evidence failed to show that the creditor who filed the second bill after the receiver had been placed in possession of the property, and which had been consolidated with the first, had had execution issued and returned *nulla bona* before filing his bill, he could not maintain his suit, although it was contended on his be-

half that the court had taken possession of the estate for the purpose of its administration and distribution, and that in such cases the equitable maxim that equality is equity must prevail, and that after the jurisdiction of the court has attached no creditor can, by any subsequent proceedings outside of the case, obtain a preference over other parties to the cause, it having been held, as before stated, that the suit was not commenced nor the receiver appointed for the benefit of all the creditors, but only for the complainant in the bill. It was further said in that case (p. 548): "The rule here contended for undoubtedly applies to cases where courts of equity take into their custody funds, and especially trust funds, with a view to their complete administration and distribution among the various parties entitled thereto. Such was the case in *Roseboom* v. *Whittaker*, 132 Ill. 81. * * * We there held, that after a court of equity had taken possession of the estate of such insolvent corporation, such estate was so far in the custody of the law that no creditor could, by subsequent proceedings by creditor's bill, establish such a lien upon the assets of the corporation as to give him a preference over other creditors. We there said: 'After the aid of a court of equity has been invoked and that court has taken the assets of the insolvent into its hands, its jurisdiction becomes necessarily exclusive, and it will proceed, in administering the insolvent estate, upon the maxim that equality is equity. After the jurisdiction has attached, ordinarily, no creditor can pursue a legal remedy, at least in such way as to obtain for himself a preference.'"

We are inclined to the opinion that the rule contended for in the *Russell case*, *supra*, but there held inapplicable, is applicable here. It must be kept in mind that the original bill was not filed simply to enforce the complainant's judgment, but others as well, and execution had been issued upon it and returned unsatisfied, and that the court had made an order, not only that appellant be

admitted as a defendant, but also all other creditors of the company having an interest in the suit. Acting upon this invitation of the court as well as of the complainant, they appeared and answered the bill, and many of them filed cross-bills attacking the Baldwin judgment as fraudulent. Besides, appellee, who now insists that appellant had no standing in the case because no execution had been issued and returned unsatisfied on its judgment, procured and had assigned to him all claims of the intervening creditors except that of appellant, sought to take the place of such claimants in the litigation, and, notwithstanding that many of them occupied no better position than appellant, asked the court, as one beneficially interested in such claims and in the proceedings to establish them, and by his supplemental bill, to distribute the fund according to the priorities alleged to have been obtained by the respective claimants. It is true he continued to insist upon the priority of the Baldwin judgments; but his position was consistent with that of the complainant in the original bill, as inviting other judgment creditors to come in, and also with that of the court indicated by its order, that all creditors interested should be admitted as defendants, and that the estate of this admittedly insolvent corporation should be administered and the proceeds distributed to its creditors. In such a case no preference could be obtained as to payment out of the fund by any creditor by legal proceedings in other suits, after the court acquired jurisdiction of the fund for purposes of its final distribution.

We are therefore of the opinion that the failure of appellant to have execution issued upon its judgment, or to have it returned by the sheriff, cannot operate in this case to defeat the enforcement of its demand if it be otherwise enforceable. However apparent it may be that prudence would dictate that the creditor should in all such cases pursue his legal remedy to its finality by means of an execution, still, the omission of what in ordinary

cases would be a necessary prerequisite to the assertion of his demand in a court of equity cannot be held fatal to appellant's rights here.

As to the next question, there can be no doubt, we think, from the evidence, that the Baldwin judgment was fraudulent, and that appellee, by its purchase, acquired no rights as against the *bona fide* creditors of the corporation. As before said, the judgment notes upon which it was based were without consideration, and, as clearly appears, were fraudulently issued to Charles Baldwin, who was at the time the principal stockholder and in the absolute control of the corporation and of its board of directors. The other two stockholders were his employees and acted upon his directions. One of them, McKay, testified that he and the other one, Thatcher, were mere puppets. It is evident that the scheme was resorted to to give the company a fictitious credit, and after such credit should be worked to the best advantage to obtain the goods of *bona fide* creditors, to then make use of these judgments notes to obtain a preference over such creditors and appropriate their goods to the satisfaction of this fictitious demand of the owner and manager of the corporation. To the more effectual consummation of this plan the notes were assigned to W. W. Baldwin, Jr., the son of appellee and cousin of the payee of said notes,— that is, to a relative who was at the time an insolvent defaulter without the means of paying for such a purchase. Soon after appellant's goods were shipped in pursuance of the order of the company, Castle, the president of the appellant corporation, went to Chicago to investigate the financial condition of the Charles Baldwin Company. Although he requested to be furnished with or to examine an inventory of the property of the corporation, his request was refused. He examined the stock of goods on hand and found it to be of the value not exceeding $22,-000. Upon inquiry of Charles Baldwin, who was in control of the business of the company, he was informed that

the assets of the company were worth about $75,000 and its liabilities did not exceed $5000, when at the same time he, Baldwin, without Castle's knowledge, held its judgment notes of $20,000. Soon afterward appellant attached the car-load of stoves which it had shipped, as a part of the order, to Baldwin's establishment at Omaha, Nebraska, Baldwin having given a mortgage on his stock in that city to the same W. W. Baldwin, Jr., which mortgage the said W. W. Baldwin, Jr., afterward, upon threat of suits by certain creditors there, declined to assert in his own behalf. The goods attached by appellant were sold by the sheriff for $465, but the suit was still pending and undetermined when this cause was heard. It is admitted that so much as may be recovered in the suit in Nebraska should, less the amount of proper costs and disbursements therein, be deducted from appellant's demands herein.

If it be said that the fraud in the organization of the company and in the giving of the judgment notes to its chief promoter, stockholder, officer and manager, occurred before appellant extended the credit in question to the company and that appellant could not avail itself of such previous frauds, still, it is clear that, the fraudulent judgment, execution and lien thereof having been obtained after the credit was extended and the fraudulent scheme being thereby consummated, appellant was as much injured by the transaction as if the judgment notes had been in fact given by the company after the credit was extended. Besides, we think the evidence shows that the fraudulent scheme was devised for the purpose of defrauding the then future creditors of the corporation as well as others, and that therefore appellant had the same right to avail itself of such fraud as prior creditors had. It appears, also, from the evidence, that appellee, when he purchased of his son, W. W. Baldwin, Jr., the Baldwin judgment, knew of the insolvent condition of the corporation; knew that Charles Baldwin was untrust-

worthy and unworthy of credit; knew of the controlling position he occupied in respect to the corporation, its business and affairs; knew of the insolvency of his (appellee's) son, W. W. Baldwin, Jr., and of the latter's inability to make a *bona fide* purchase of the notes in question. It was proved by two witnesses that appellee stated, in substance, that he had interested himself in the affairs of the company, or in the affairs of Charles Baldwin, because the latter was the son of an older brother who had been a father to him. But, at all events, it is clear that the appellee, as the assignee and owner of the judgment, stood in the same position as that occupied by W. W. Baldwin, Jr., and that neither of them could enforce such judgment as against the *bona fide* creditors of the corporation.

W. W. Baldwin, Jr., died before the hearing below and Charles Baldwin had kept himself concealed, so the testimony of neither was obtained in the case. Appellee, however, when examined by appellant's counsel as a witness before the taking of the testimony was finally closed, testified that Charles Baldwin was living in Springfield, Missouri, and employed as local manager in the stove works there, under appellee, who was the general manager. Appellee paid nothing for the claims which he purchased except what he received thereon as assignee thereof out of the moneys which he had paid to the receiver for the property and assets of the corporation.

The record is too voluminous to recite more of it here, but we think, from the evidence, that the finding should have been that in purchasing and procuring the assignment of these claims against the corporation appellee was acting for Charles Baldwin, and that he did not, therefore, as a *bona fide* purchaser and assignee of the claims, take the place of advantage held by the several claimants, and stand upon a footing of equality with appellant in the distribution of the fund. What was done in the matter of the alleged purchase and assignment of the several claims of the company in legal effect amounted

to no more than this: that Charles Baldwin, or the corporation, acting by appellee, through the connivance of Charles Baldwin, settled and took up all of said claims of the creditors of the corporation except that of appellant, and used for that purpose all of the assets of the corporation except the $2200 in controversy deposited with the clerk by the order of the court as security for the payment of the claim of appellant. Appellant's claim is therefore the only one remaining unpaid, so far as the record discloses, and it should be satisfied out of the money so deposited.

It is not important to this holding that appellee may never have intended to become a party to the fraudulent schemes of Charles Baldwin by the purchase of the Baldwin judgment, but that he bought and sought to collect the same for the purpose of making money for himself, or of reimbursing himself for moneys which he had paid out for his son, W. W. Baldwin, Jr., or because of his desire to benefit Charles Baldwin on account of kinship, for, whatever his motives may have been, the effect of what he did was to carry out and consummate the fraudulent schemes of Charles Baldwin and W. W. Baldwin, Jr., and he stood only in their shoes. Courts of equity will not be prevented from protecting the equitable rights of parties by the mere garb or form in which persons devising fraudulent schemes to obtain the property of others without recompense have clothed their illegal transactions. The practice of taking advantage of the forms of law and of proceedings of courts of justice to perpetrate such frauds, by organizing fraudulent corporations and by obtaining fraudulent judgments, is by no means uncommon. To permit laws enacted for the public good to be so perverted and courts of justice to be so used and imposed upon, and then to say that there is no remedy because what was done was done under the forms of law, would be to make the law and the courts themselves the instruments of dishonest schemers.

It is said that no deduction has been made on account of what may be realized from the sale of the stoves attached by appellant in Nebraska, and appellant may receive, in part, a double payment. The trial court has power, however, to withhold the entering of the decree until the proper credit to be given, if any, shall have been ascertained.

Something was said in appellee's briefs in this court as well as in the Appellate Court to the effect that the appeal to the Appellate Court was not taken in apt time. But this question was not properly raised in the Appellate Court so as to require a decision of it there. The appeal to this court was properly taken, and in the absence of any decision of the Appellate Court on the question we cannot dismiss the appeal to that court. If appellee thought the appeal from the trial court was not taken in apt time he should have made his motion in the Appellate Court to dismiss the appeal, and if that court had denied his motion, he could on cross-errors have had its decision reviewed by this court on this appeal.

The judgment of the Appellate Court and the said decree of the circuit court are both reversed and the cause is remanded to the latter court, with directions to enter a decree in accordance with the views herein set forth.

*Reversed and remanded.*